IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEANNE STORCH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 3656 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| | ) | |
| WEST TOWN REFRIGERATION CORP., | ) | |
| REEDY INDUSTRIES, INC., AND | ) | |
| RAYMOND F. FIEDLER, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Leanne Storch ("Storch" or "Plaintiff") was an employee of West Town Refrigeration Corp. ("West Town") until her supervisor, Raymond C. Fiedler ("Fiedler"), terminated her on May 12, 2003, during an alleged reorganization of the department in which Plaintiff worked. Plaintiff, who was diagnosed with idiopathic pulmonary fibrosis ("IPF") in January 2003, brought the present action against West Town, Fiedler, and Reedy Industries, Inc. ("Reedy") (collectively "Defendants") under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101, *et seq.*, ("Count I") contending that the real reason Defendants terminated her was because of her IPF condition. Plaintiff also brought an action against Defendants for defamation *per se*, ("Count II") stemming from statements Fiedler allegedly told other West Town employees about Plaintiff that imputed an inability of Plaintiff to perform her job.

1

Defendants have moved for summary judgment on both counts. Because Plaintiff cannot show that she was disabled under the ADA at the time of her termination from West Town, Defendants' motion for summary judgment on Count I is granted. Because Fiedler's alleged statements are inadmissible hearsay, and because Plaintiff has produced no admissible evidence to support the allegation that the statements were ever uttered, Defendants' motion for summary judgment on Count II also is granted.

## STATEMENT OF FACTS

Storch was an employee of West Town, a company located in Oak Park, Illinois. (Defs.' 56.1 ¶¶ 2, 5.) West Town is a corporation that provides heating and air conditioning services. (*Id.* at ¶ 2.) Reedy is a Glenview, Illinois-based corporation that issues the West Town company policy memo, which provides a guide for the practices and procedures of West Town. (Pltf.'s 56.1(b)(3)(B) ¶ 22.) William P. Reedy is the president of both Reedy and West Town. (*Id.* at ¶ 23.)

### Storch's Employment

Storch began working at West Town in December 1998. (*Id.* at ¶ 6.) Her job included answering customer phone calls, processing work orders, providing clerical assistance, keeping track of accounts receivable, typing up sales contracts, arranging for technicians to provide service to customers, and arranging for air filter changes. (*Id.* at ¶ 12.) Storch had to prepare purchase orders and make records of the use of the air filters, ensuring that technicians at customer locations had the correct type and number of filters. (*Id.* at ¶ 13.)

A former employee who worked with Storch from December 1998 through September 2000 described Storch as "an excellent and conscientious employee." (Waller Decl., at ¶¶ 4, 8.)

He said that Storch properly ordered filters well in advance of maintenance inspections, and he never heard any supervisor of Storch reprimand her for her job performance. (*Id.* at ¶¶ 6, 7.)

However, another West Town employee disagrees with that assessment. West Town Sales Representative Charles Caporale claims that Storch used the company phone for personal reasons during work time, failed to properly order filters for customers, and failed to promptly type customer proposals or timely process work orders. (Caporale Decl., at ¶¶ 4, 5.) Caporale stated that he repeatedly counseled Storch about her alleged failure to type timely the proposals and that Storch failed to improve her performance. (*Id.*) Another employee stated that Storch frequently left her workstation to socialize with West Town technicians, walked off the job on Fridays without notice, and frequently used West Town computers for personal reasons. (Gnoth Decl., at ¶ 5.)

Defendants claim that Plaintiff's alleged failures on the job led to problems for West Town technicians. (Defs.' 56.1 ¶ 17.) Defendants say that Storch misplaced lists of filters she needed to order for clients. (*Id.*) They also claim she failed to arrange properly changes of air filters on a timely basis. (*Id.* at ¶ 16.) Storch denies the claims. (Pltf.'s Resp. ¶¶ 16, 17.) West Town technicians who claimed that Storch would misplace their lists say that they experienced no further problems with filter orders after Storch was terminated. (Defs.' 56.1 ¶ 18.)

Nevertheless, Storch did receive several raises during her employment at West Town, although each year the amount of the raise decreased. (Lichtenberger Decl., at ¶ 3.) For example, Storch received a 5.5 percent raise from West Town in 1999, a 4 percent raise in 2000, a 3 percent raise in 2001, and a 2 percent raise in 2002—her final full year of employment with West Town. (*Id.*) She also received year-end bonuses, beginning with an $800 bonus in 1999,

which increased by $100 each year, up to $1000 in 2001. (*Id.* at ¶ 4.) In 2002, Storch's bonus decreased by $100 to $900. (*Id.*)

### Storch's Termination

Defendants claim that because of Storch's allegedly unsatisfactory performance at work, West Town terminated her on May 12, 2003. (Defs.' 56.1 ¶¶ 9, 11.) That day, Storch met with Fiedler, who was the vice-president of West Town and Storch's supervisor for her entire employment. (*Id.* at ¶ 8.) Fiedler says that he told Storch that the department was going through a reorganization to make it more efficient. (Fiedler Dep., p. 25.) Storch contends that this explanation was pretextual, since Fiedler hired only one new employee to take her place. (Pltf.'s 56.1(b)(3)(B) ¶ 21.) Plaintiff claims that the same amount of employees worked in her department after her termination as worked in her department prior to her termination. (*Id.*) But the new employee was hired to be a new dispatcher, which was a different position than the job Plaintiff held. (Storch Dep., p. 17.) Defendants claim that Plaintiff's duties were divided between Gnoth and the new employee. (Defs.' Resp. ¶ 21; Fiedler Dep., p. 29.)

Plaintiff also claims that West Town and Fiedler treated her differently than other employees. (Pltf.'s Mem., p. 8.) She claims that Gnoth would regularly use company phones for personal phone calls, would use a company computer to send and receive personal e-mails, and would use an instant messenger system on a company computer to communicate with family during work hours. (Pltf.'s 56.1(b)(3)(B) ¶¶ 18-20.) Defendants dispute these claims, while Gnoth contends that Storch herself used the phones for personal calls and used a West Town computer to search the Internet. (Defs.' Resp. ¶¶ 18-20; Gnoth Decl., at ¶ 5.)

Storch contends that no one raised an issue with her job performance for several years prior to her termination, and that her official written reprimands were limited to three occasions.

(Pltf.'s Resp. ¶ 33; Pltf.'s 56.1(b)(3)(B) ¶ 3.) Fiedler told Storch that she could use him as a reference in her search for new work. (Pltf.'s Resp. at ¶ 2.) Defendants, on the other hand, claim that Defendants experienced several problems with Storch's work performance, including excessive personal phone calls and leaving her desk to talk on the phone, and that Fiedler counseled Storch on several occasions to limit her telephone calls. (Defs.' Resp. ¶ 3; Defs.' 56.1 ¶ 26.) While Defendants concede Fiedler agreed to be a reference for Storch, they deny that Storch still performed her work at an acceptable level. (Defs.' Resp. ¶ 2.) Storch admits that she downloaded screensavers and a blackjack game onto her company computer and used an instant messenger system on that computer. (Pltf.'s Resp. at ¶¶ 36-39.) She also admits to using the phone for personal calls, but she claims that she did so rarely, and was only counseled about the issue twice. (*Id.* at ¶¶ 22, 23, 26.)

### Storch's Illness

Storch always had a chronic cough, but it never proved too problematic. (Pltf.'s App., p. 19.) The cough increased in 2002, and in October of that year she first noticed dyspnea (a feeling of breathlessness). (*Id.*) After meeting with doctors, Storch was diagnosed with IPF in January 2003. (Defs.' 56.1 ¶ 46.) Marked by progressive scarring of the lungs, IPF is a debilitating disease that interferes with a person's ability to breathe. (Pltf.'s Ex. B.) The fibrosis is idiopathic because it has an unknown cause. (*Id.*) There is no known cure for IPF, and it always results in death. (Amesbury Decl., at ¶¶ 5, 7.)

In the five months between her diagnosis and her termination, Storch began using supplemental oxygen at night and taking doses of Prednisone to reduce inflammation in her lungs. (Pltf.'s Resp. ¶ 48.) She claimed that the drug caused her to be distracted at work. (*Id.*) One month after she was fired, on June 12, 2003, a pulmonary function report found her lung

volume to be only 60 percent of the predicted range and described Storch's condition as a "moderately severe restrictive defect." (Pltf.'s 56.1(b)(3)(B) ¶ 16.)

In spite of this diagnosis, Storch testified that when she was terminated, there were no mental or physical activities in which she could not participate. (Defs.' 56.1 ¶ 48.) She did not use oxygen at work or at any time during the day when she was still employed at West Town. (*Id.* at ¶ 50.) The only thing she could not do was strenuous exercise, which she did not do before her diagnosis. (*Id.* at ¶ 49.) Storch stated that she would "get really winded easily" before she began using oxygen during the day. (*Id.* at ¶ 54.) Two years after her termination, she was still able to walk provided that she had her oxygen with her. (*Id.* at ¶ 53.) Although, she tires more easily and her pace is slower now when she walks. (Storch Dep., p. 108.)

### The Insurance

Storch claims that her termination was not due to her performance at work, but rather because the Defendants knew of her illness—especially its progressive nature—and terminated her to avoid paying expensive insurance costs in the future. (Storch Dep., p. 93; Defs.' 56.1 ¶ 55.) She claims that Fiedler was familiar with IPF because of his friendship with Mike Rodriquez, another West Town employee, who had pulmonary problems in 2002. (Pltf.'s 56.1(b)(3)(B) ¶ 4; Pltf.'s App., p. 17.) Defendants contend that Fiedler was aware of the disease but was not familiar with it. (Defs.' Resp. ¶ 4.)

At the time of her termination, Storch was not enrolled in the West Town Health Insurance Plan. (Fiedler Dep., p. 37.) When she was first employed, she opted not to enroll in the plan. (Storch Dep., p. 41.) One month before her termination, Storch contacted Reedy employee Holly Ebner to inquire about enrolling in the program. (Defs.' 56.1 ¶¶ 60, 61.) Storch claims that she could have enrolled in the West Town Health Insurance Plan if the company had

not terminated her.  (Pltf.'s 56.1(b)(3)(B) ¶ 10.)  Defendants disagree, and state that the company has a right to deny coverage to an employee who does not enroll in the plan when first eligible. (Defs.' Resp. ¶ 10.)

Employees contribute to the long-term disability insurance at West Town, but the plan pays the greater share of expenses for health care insurance coverage for its employees.  (Pltf.'s Resp. ¶ 57; Pltf.'s 56.1(b)(3)(B) ¶ 11.)  Also, West Town pays the full cost of the life insurance policy for its employees.  (*Id.* at ¶ 14.)  Nevertheless, Defendants contend that West Town would not have incurred any additional expense because of Storch's condition.  (Defs.' 56.1 ¶ 58.)

### Events Following Termination

Storch collected unemployment between May 2003 and March 2004.  (Storch Dep., p. 92.)  In March 2004, she was hired as an executive assistant at the Pulmonary Fibrosis Foundation in Chicago.  (Storch Dep., p. 124.)  Her IPF has progressed to the point where she takes supplemental oxygen 24 hours a day, seven days a week.  (Pltf.'s Resp. ¶ 51; Storch Dep., p. 102.)  Nevertheless, Storch still claimed in 2005 that as long as she takes her supplemental oxygen with her, she is not limited in her life activities.  (Defs.' 56.1 ¶¶ 52, 53; Storch Dep., p. 130.)

### STANDARD OF REVIEW

Summary judgment is correct when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must construe all facts in a light most favorable to the non-moving party and view all reasonable inferences in the non-moving party's favor to determine if a genuine issue of a material fact exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986). A material fact is one that is outcome-determinative under governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). In analyzing the facts for the purposes of a summary judgment, the Court will "limit its analysis of the facts…to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). But a party must do more than rely on unsubstantiated facts to defeat summary judgment. *Greer v. Bd. of Educ. of the City of Chi.*, 267 F.3d 723, 729 (7th Cir. 2001). Parties must cite to specific support in the record. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

## DISCUSSION

### *Count I*

The ADA safeguards "qualified individuals with a disability from discrimination in their employment, hiring process, or promotions." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380 (7th Cir. 2005); 42 U.S.C. § 12112(a). To make a successful ADA claim, a plaintiff must prove four requirements for a *prima facie* case: (1) that she is disabled within the meaning of the ADA (and thus a member of a protected group); (2) that she performed her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that similarly situated employees received more favorable treatment. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001). Under the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), if the plaintiff meets all four requirements, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for its employment decision. If the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's reasoning was pretext. *Id.*

Both parties concede that Plaintiff has suffered an adverse employment action and focus their disagreement on the remaining three elements of the *prima facie* case. In order to proceed,

Plaintiff must meet her "threshold burden" of satisfying the first element: she must establish that she is disabled as defined by the ADA. *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). If she cannot establish that she is disabled, her claim fails regardless of whether she meets the other elements of her case: "If [Storch's] condition does not rise to the level of a disability as defined by the ADA, then [s]he cannot prevail on [her] claim even if [defendants] terminated [her] expressly because of [her] condition." *Moore v. J.B. Hunt Transp.*, 221 F.3d 944, 950 (7th Cir. 2000).

A plaintiff can prove a disability under the ADA definitions in one of three ways. The ADA defines a disability as: "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §12102(2). Because Plaintiff cannot prove that her IPF was a disability under any of these three definitions, she cannot meet the first prong of the *prima facie* test for discrimination under the ADA, and therefore cannot survive summary judgment.

### **Subsection (A): Substantial Limitation of a Major Life Activity.**

In order to assess whether a plaintiff has a disability as defined by subsection (A) of 42 U.S.C. §12102(2), "a physical or mental impairment that substantially limits one or more of the major life activities," courts must employ a three-part test. *Bragdon v. Abbott*, 524 U.S. 624 (1998). First, the condition must be a physical or mental impairment. *Id.* at 632. Second, the impairment must hinder a "major life activity" for purposes of the ADA. *Id.* at 637. Third, such a hindrance must be a substantial limit on the major life activity. *Id.* at 639.

First, there is no doubt that Plaintiff suffers from an impairment. Under the ADA, a physical or mental impairment includes any disorder affecting a number of body systems,

including the respiratory system.  *See* 29 C.F.R. § 1630.2(h)(1).  Plaintiff has IPF, a degenerative lung condition for which there is no known cure and which always results in death.  (Amesbury Decl., at ¶¶ 5, 7.)

Second, Plaintiff alleges in her complaint that her IPF has impaired her ability to breathe, as well as impaired "most, if not all, major life activities."  (Pltf.'s Resp. ¶ 45; Complaint at ¶ 23.)  Major life activities are those activities "integral to one's daily existence."  *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001).  Breathing, walking, sleeping, and working—activities that Plaintiff's IPF could hinder—are mentioned specifically as a major life activities under the ADA.  29 C.F.R. § 1630.2(i).

Third, to show that she has a disability, Plaintiff must be able to show that her IPF substantially limited her ability to perform the major life activity.  42 U.S.C. §12102(2)(A); *see, e.g., Bragdon*, 524 U.S. at 639; *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).  Not all impairments are substantial enough to be deemed a protected disability under the ADA.  *Dalton v. Subaru-Isuzu Auto*, 141 F.3d 667, 675 (7th Cir. 1998); *see also Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997) ("The Act is not a general protection of medically afflicted persons.").  A person is substantially limited in a major life activity if she is unable to perform the activity or is significantly restricted in the "condition, manner or duration" of performing the activity as compared to the average person in the general population.  29 C.F.R. § 1630.2(j)(1).  In deciding whether a plaintiff is substantially limited, courts should consider the nature and severity, the duration, and the expected permanent or long-term impact of the impairment.  29 C.F.R. § 1630.2(j)(2).

Moreover, the assessment as to whether a person is substantially limited by their condition is an individualized one.  *Albertson's Inc., v. Kirkingburg*, 527 U.S. 555, 567 (1999)

(Plaintiffs must prove their disability by "offering evidence that the extent of the limitation in terms of their own experience" is substantial.).  Being a member of a class of people diagnosed with a condition is not sufficient; what is relevant is whether the actual *physical impairments* caused by the diagnosed condition are such that they substantially impair the individual's major life activity.  *Toyota Motor Manufacturing, Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).  The test is for limitations, not for conditions or impairments, because "some impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or the disorder."  *Moore*, 221 F.3d at 952.  In determining whether a plaintiff is substantially impaired, courts must consider any corrective or mitigating measures that the plaintiff uses, such as medications or prostheses.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999); *Lawson*, 245 F.3d at 924 ("We must examine the plaintiff's condition as it exists after corrective or mitigating measures used to combat the impairment are taken into account.").  If the plaintiff can perform the major life activity in a condition, manner or duration relatively equal to that of an average person while using the corrective measures, she is not substantially limited and thus not disabled under the ADA.  *Id.*

Plaintiff cites breathing as the only major life activity impaired by her condition in her Local Rule 56.1 statement, despite claiming in her complaint that her IPF could affect "most, if not all, major life activities."  (Pltf.'s Resp. ¶ 45; Compl. ¶ 23.)  The parties disagree over what major life activity that Plaintiff suffers from.  (Pltf.'s Resp. ¶ 45.)  Construing the major life activities as defined under 29 C.F.R. § 1630.2(i) broadly in favor of the Plaintiff, the evidence of Plaintiff's condition could show limitations on breathing, walking, working, and sleeping. Regardless, viewing the facts in a light most favorable to Plaintiff, Plaintiff has failed to show

that at the time of her termination from West Town, her IPF imposed a substantial limitation on any of these major life activities.

**Breathing.** In her attempt to show her breathing is severely or substantially restricted, Plaintiff provides much undisputed evidence of her condition through medical tests and doctor testimony. Specifically, she presents tests that indicate that her lung volume was 60 percent of normal on June 12, 2003, which demonstrated a "moderately severe restrictive defect." (Pltf.'s 56.1(b)(3)(B) ¶ 16.) Plaintiff took supplemental oxygen at night beginning in January 2003 upon being diagnosed with IPF. (Pltf.'s Resp. ¶ 48.) In February 2003, she took 60-milligram doses of the prescribed drug Prednisone to reduce inflammation in her lungs, which caused her to be "highly distracted" at work. (*Id.*) She demonstrated "a subsequent decline" in her lungs' diffusion capacity by June 13, 2003, as compared with pulmonary function tests taken December 23, 2002, and March 4, 2003. (Pltf.'s Resp. App., p. 15.) She noticed dyspnea when walking on flat ground and particularly when climbing stairs. (Pltf.'s Resp. App., p. 19.) Dr. Edward Garrity recommended Plaintiff take the drug Actimmune in the hopes it would delay the need for a lung transplant. (Pltf.'s 56.1(b)(3)(B) ¶ 17.) But viewing all these facts in a light most favorable to the Plaintiff for purposes of this motion, the Plaintiff still has failed to show that she was substantially limited in breathing to be deemed disabled under the ADA.

First, to show that a person has a disability under the ADA, a plaintiff must show that a condition substantially affected her ability to perform a major life activity. *Bragdon,* 524 U.S. at 637. As such, a person must do more than rest solely on her status when alleging an ADA claim. *See Nawrot v. CPC Int'l*, 277 F.3d 896 (7th Cir. 2002) (upholding an ADA claim by a diabetic who did not rest simply on his status, but who instead showed that he was not in complete control of his blood sugar level). The factors that a court must evaluate to conclude that a

plaintiff is disabled under the ADA are not conditions, disabilities or diseases *per se*. *Toyota*, 534 U.S. at 198 ("It is insufficient…to merely submit evidence of a medical diagnosis of an impairment."). Instead, "[t]he activities that have been held to be major life activities under the ADA…are not the impairments' characteristics—they are [major life] *activities* that have been impacted because of the plaintiffs' impairments." *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001) (emphasis in original). In *Furnish*, the Court rejected an argument that Hepatitis B should be a disability because it was a chronic illness affecting the functioning of a major life organ. *Id.* The Court held that liver function was not a major life activity since it described a characteristic of an impairment rather than a limitation on a major life activity. *Id.*

Like the plaintiff in *Furnish*, Plaintiff in the present case has produced only evidence that demonstrates characteristics or consequences of her condition rather than evidence demonstrating how that condition creates limitations on her life. *But cf.*, *Nawrot*, 277 F.3d at 904 (plaintiff's diabetes forced him to test his blood sugar ten times a day, which was ruled to be a substantial burden). Medical tests that demonstrate reduced pulmonary functioning, lung volume and diffusion capacity describe a characteristic or symptom of IPF, not a limitation on the Plaintiff's daily ability to breathe. IPF, in and of itself, is not a disability simply because "it is a chronic illness that affects the functioning of a major organ." *Furnish*, 270 F.3d at 450. "Only when the impact of the illness substantially limits a major life activity…is an individual considered disabled within the meaning of the ADA." *Id.* Here, plaintiff lacks the crucial connection between the condition itself and the impact of that condition. While it is debatable whether a "moderately severe restrictive defect" is equivalent to a "substantial limitation" under the ADA, the point is moot because these tests only describe the defect itself (for example, lost lung volume). They do not describe any actual life activity (for example, breathing) that the

defect would, in turn, impair.  Moreover, Plaintiff admits that she is not substantially restricted in her ability to breathe despite all the medical testimony she presents.  (Storch Dep, p. 131.)

Plaintiff goes beyond medical evidence and attempts to show her disability by relying on the statements of pulmonologist Dr. Stephen Amesbury that Plaintiff was placed on the transplant list in January 2003.  (Defs.' Resp. ¶ 15; Pltf.'s 56.1(b)(3)(B) ¶ 15.)  Presuming that Dr. Amesbury meant for Plaintiff to go on the transplant list as of January 2003 at the time he wrote the letter—as Plaintiff contends—Plaintiff still fails to show the requisite physical limitations required under *Bragdon* and 42 U.S.C. § 12102(2)(A) because being on a transplant list is not evidence of a restriction in a major life activity.  *See, e.g.*, *Sutton*, 527 U.S. at 488 (the "nonuse of a corrective device does not determine whether an individual is disabled").  Being on the transplant list, much like a diagnosis, only describes the status or progression of Plaintiff's IPF, not its impact on her breathing.  *See Furnish,* 270 F.3d at 450.  It does nothing to show whether Plaintiff's actual, individual life activity of breathing is or is not substantially limited. *See, e.g., Toyota*, 534 U.S. at 198.  Though she may be waiting for a new lung, Plaintiff testifies that she can still use her current lungs, albeit with supplemental oxygen, to breathe without substantial difficulty.  (Pltf.'s Resp. ¶¶ 48, 53.)  The test as to whether a condition substantially restricts a major life activity is an individualized inquiry.  *Kirkingburg*, 527 U.S. at 567.  That Plaintiff has a condition is not enough to show her disability; she personally must be limited by her IPF, but Plaintiff has admitted that she is not. (Pltf.'s Resp. ¶ 48.)

Second, even if her diagnosis was sufficient evidence of a substantial limit on her ability to breathe, the Court must take into account the effects, both good and bad, of any corrective measures in evaluating whether the Plaintiff is disabled under the ADA.  *Sutton*, 527 U.S. at 482.  Plaintiff relies upon the fact that she takes medication for her condition, and that she required

supplemental oxygen at night in early 2003, as evidence of her disability. But the prescriptions and the oxygen are corrective measures, not limitations, and according to Plaintiff's own testimony, the corrective measures are mostly positive: Plaintiff testifies that when she uses her supplemental oxygen, she can "do [her] life." (Storch Dep., p. 130.)

The parties disagree as to when Plaintiff began using supplemental oxygen during the day. (Pltf.'s Resp. ¶ 51.) Defendants claim Plaintiff began using the oxygen during the day in September 2004. (Defs.' 56.1 ¶ 51.) Plaintiff claims that she began taking supplemental oxygen around-the-clock in September 2004 and that she began to take daytime oxygen long before that date. (Pltf.'s Resp. ¶ 51.) However, she cites no specific date as to when she began taking daytime oxygen. Even if she had provided that information, and even resolving this disagreement in favor of the Plaintiff by assuming that she took daytime oxygen long before September 2004, Plaintiff, in her own testimony, explicitly rejected the notion that she was substantially limited in her ability to breathe, with or without the use of oxygen as a corrective measure. (Pltf.'s Resp. ¶ 53.)

Moreover, Plaintiff was not disabled *at the time* that she was employed at West Town. Her actions during her employment are the only relevant factors in evaluating whether she has a disability under the ADA. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Whether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made."). Even if Plaintiff began using supplemental daytime oxygen to help her breathe at a date sometime before September 2004, she began doing so *after* she was terminated from West Town in May 2003. (Pltf.'s Resp. ¶ 50.) And while she claimed that she was winded on the day of her deposition in 2005, (Pltf.'s Resp. ¶ 49), this evidence cannot speak to whether her breathing was substantially limited while

employed at West Town two years earlier. *See Sutton*, 527 U.S. at 482 (A plaintiff is disabled when an impairment substantially limits an activity in its present time, not in a future time.). Finally, and perhaps most telling, Plaintiff herself testified that she was not substantially limited in her ability to breathe during the time she worked at West Town. (Storch Dep., p. 109; Pltf.'s Resp. ¶ 53.)

*Walking.* Plaintiff also claims that she was substantially impaired in her ability to walk. To prove this claim, Plaintiff must show her limitation is "permanent or long term, and considerable compared to the walking most people do in their daily lives." *Sears*, 417 F.3d at 802.

Plaintiff notes that in March 2005 she had to stop and rest after walking up only six steps. (Pltf.'s Resp. ¶ 49; Storch Dep., p. 127.) She states that her pace is slower now and that she can get winded easily. (Storch Dep., p. 108; Pltf.'s Resp. ¶ 53, 54.) However, for the same reasons that she was unable to prove a substantial limitation in her breathing, Plaintiff has not proven a substantial limitation in her ability to walk.

First, limitations on the rate or pace of an action are not substantial enough to meet ADA requirements. *See Moore*, 221 F.3d at 951 (plaintiff with rheumatoid arthritis who was able to walk, only at a slower pace than most people, was not substantially limited so as to be disabled under the ADA). Moreover, Plaintiff's actual limitations are too minor to qualify under the ADA.[1] *See, e.g., Cho v. Walgreen Co.*, 1999 WL 498594 (N.D.Ill. July 6, 1999) (plaintiff with

_____

[1] Plaintiff cites *U-Haul Co. of Cleveland v. Kunkle*, 165 F.3d 29, 1998 WL 681253 at *5 (6th Cir. 1998), an unpublished opinion from another circuit, as support for her claim that she was disabled under the ADA. However, her situation differs from the facts of that case. In *Kunkle*, the plaintiff survived summary judgment by showing that he had difficulty breathing and occasionally went to his truck to retrieve oxygen. *Id.* But unlike the plaintiff in *Kunkle*, Plaintiff did not use oxygen at work while employed at West Town. (Storch Dep., p. 109.) She

cerebral palsy who walked with a slight limp ruled not substantially limited in walking because it took him only "a little longer" to walk compared to the general population); *Graver v. Nat'l Eng'g*, 1995 WL 443944 (N.D. Ill. July 25, 1995) (plaintiff who walked slowly while experiencing significant pain and limping deemed not substantially limited); *Thompson v. Am. Hosp. Ass'n*, 1996 WL 563455 (N.D. Ill. Sept. 30, 1996) (plaintiff whose condition caused him to get "short-winded," but who was limited only in climbing stairs, deemed not disabled under the ADA). Like the plaintiff in *Cho*, Plaintiff may only take slightly longer to walk up steps. And Plaintiff has even less limitation than the plaintiff in *Graver*, since she has claimed no pain or limping when she walks. *But cf. Sears*, 417 F.3d at 802 (plaintiff who was unable to walk the equivalent of one city block before her leg became numb, walked with a cane, felt that walking was nearly impossible, and had to hold onto a wall for support when walking deemed substantially limited). The plaintiff in *Sears* was in a situation far different from the current Plaintiff, who stated her only limitation is that she could not run marathons. (Storch Dep., p. 131.)

Second, even if Plaintiff's ability in 2005 to walk only six steps before resting created a genuine issue as to whether she was disabled under the ADA, the question is moot because the only period relevant to the lawsuit is the period of employment with West Town in 2003. *See Bay*, 212 F.3d at 974. A plaintiff is disabled when an impairment substantially limits an activity in its present time, not in a future time or where it "might, could or would be substantially limiting." *Sutton*, 527 U.S. at 482. Otherwise, any degenerative condition that ultimately would

---

did not use oxygen during the day until more than a year after she was terminated. (Storch Dep., p. 102.) She also testified that there were no job-related activities in which she could not participate at West Town, despite her IPF. (Storch Dep., p. 109.)

be substantially limiting could be deemed a disability under the ADA, even at its infant stages when it imposes no restrictions. *Scheerer v. Potter*, 443 F.3d 916, 921 (7th Cir. 2006) ("[T]aken to its logical conclusion, [plaintiff's] argument here would result in *any* individual with a progressive disease being designated as disabled at *any* point in time, merely because of the likely progressive nature of the impairment.") (emphasis in original). Plaintiff testified that in 2003, at the time of her termination, her IPF imposed no substantial physical limitation. (Pltf.'s Resp. ¶¶ 48, 52, 53.) Thus, no reasonable jury could find otherwise, regardless of how Plaintiff's IPF progressed after West Town terminated her.

Third, even if the Court were to consider Plaintiff's current physical limitations, Plaintiff's IPF would still not rise to the level of an impairment under the ADA. Plaintiff testified that as long as she brings her oxygen tank with her, she has little to no trouble walking. (Pltf.'s Resp. ¶ 52). *See Sears*, 417 F.3d at 802 (progression of plaintiff's impairment subsequent to her resignation was not a direct factor to prove her disability, but it did lend credence to the argument that she was substantially limited while employed with defendant). Unlike the plaintiff in *Sears*, whose ability to walk slowly degenerated after leaving her employer, Plaintiff in the present case has shown no such degeneration. (Pltf.'s Resp. ¶ 52.) She made that statement on the same day in 2005 that she had to rest after walking the six steps. (*Id.*; Storch Dep., p. 127.) Considering Plaintiff's limitations either in 2003 or 2005 in light of corrective or mitigating measures, Plaintiff thus has failed to show, by her own admission, that her ability to walk was considerably limited compared to most people.

**Working.** Plaintiff's IPF could also be construed to limit her ability to work at West Town. Working is another major life activity designated under the ADA. 29 C.F.R. § 1630.2(i).

If Plaintiff were substantially limited in her ability to work, she would be disabled under the ADA. 42 U.S.C. § 12102(2)(A).

A person is limited in her ability to work when she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). However, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* A plaintiff will not be disabled under the ADA unless she can produce evidence suggesting she is "precluded from performing a class of jobs or a broad range of jobs in various classes." *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998). Plaintiffs can do this by showing that she faced "significant restrictions in her ability to meet the requirements of other jobs." *Id.* It is "not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996).

Plaintiff also fails to show that she is substantially limited in this major life activity. She testified that she had no problems working in her role at West Town despite her condition. (Pltf.'s Resp. ¶ 52.) In fact, she did not even use her oxygen at work to mitigate her IPF. (Storch Dep., p. 99.) Even if Plaintiff did use her oxygen at work, her ability to work would be evaluated in light of that corrective measure, which she claims helps her overcome any limitation imposed by IPF. *See Sutton*, 527 U.S. at 482; Pltf.'s Resp. ¶¶ 52, 53. She would still be able to perform her role at work, according to her own testimony. (Pltf.'s Resp. ¶ 52). *But cf. Bond v. Sheahan*, 152 F.Supp. 2d 1055 (N.D. Ill. 2001) (whether plaintiff who used three inhalers, a home nebulizer and Prednisone to treat her asthma was disabled under ADA deemed a disputed

material fact when smoke in workplace aggravated her condition and when she remained symptomatic despite her corrective measures).

Nevertheless, Plaintiff attempts to rely upon the side effects of the corrective measures as evidence of a substantial limitation. She claims that the Prednisone she took for her lungs left her distracted at work. (Storch Dep., p. 103). But according to Plaintiff's own testimony, any negative side effects those corrective measures caused her are not substantial. Plaintiff claimed that the Prednisone made her distracted *at work*, but then moots the issue by claiming that it did not affect her ability *to do work*. (Storch Dep., pp. 103, 130.) She also says there were no mental activities that she could not participate in during her employment with West Town. (Pltf.'s Resp. ¶ 48). *Cf. Sutton*, 527 U.S. at 488 (petitioners who had 20/20 visual acuity after using corrective lenses ruled to not have a substantial limitation in a major life activity). Thus, however distracting the medication was, the undisputed testimony on record shows it did not meet the level of a substantial limitation. Given such an admission, no reasonable jury could find that Plaintiff is substantially limited in the condition, manner or duration of working relative to the general population. *Cf. Rooney*, 410 F.3d at 380 (plaintiff ruled not disabled under the ADA when he testified at his deposition that he was able to perform all major life activities).

The only activity that Plaintiff could not perform at work was lifting heavy boxes. (Storch Dep., p. 109.) However, that was not a task that she was required to do normally. (*Id.*) Someone with comparable skills in her job role would not have to lift heavy boxes, and thus her inability to do so does not differ significantly from the average person. *See* 29 C.F.R. § 1630.2(j)(3)(i). Moreover, her inability to perform that "single, particular job," in and of itself, is not a substantial limitation. *Id.; Best v. Shell Oil Co.*, 107 F.3d 544, 548 (7th Cir. 1997) (Plaintiff must show more than the fact that her impairment "prevented [her] from performing

one narrow job for one employer.").  By her own admission, Plaintiff can "do it all."  (Storch Dep., p. 109.)

Plaintiff is now employed in a similar position with the Pulmonary Fibrosis Foundation. (Storch Dep., p. 124.)  She has not produced any evidence to show that she was precluded from performing a broad range of jobs, especially a class of jobs requiring comparable skills as the job she held at West Town.  *Cf. Skorup*, 153 F.3d at 512 (plaintiff with fribromyalgia who could work in racking department without accommodation, but not closures department, and who later secured other unrelated employment, deemed not disabled under ADA.)  Plaintiff has not identified what requirements posed by other types of jobs "were problematic in light of the limitations her [IPF] imposed upon her." *Id.* at 515.  She thus has not shown that her IPF has "substantially limit[ed] employment generally." *Weiler*, 101 F.3d at 524.

***Sleeping.*** Plaintiff briefly mentioned that the Prednisone she took for her lungs caused her to have some trouble sleeping.  (Storch Dep., p. 105.)  Sleep is a major life activity under the ADA. *See* 29 C.F.R. § 1630.2(i).  However, Plaintiff has not brought forth any further facts to show that she was *substantially* limited in her ability to sleep relative to the general population. *But cf. Silk v. City of Chi.*, 194 F.3d 788, 799 (7th Cir. 1999) (plaintiff with severe sleep apnea, dangerous enough to potentially cause hypertension or stroke, deemed disabled for purposes of defeating summary judgment).  As a party cannot rest on allegations alone, Plaintiff cannot survive summary judgment on a claim involving sleeping. *Greer*, 267 F.3d at 729.

### Subsection (B): Record of a Substantial Impairment

Although Plaintiff does not allege in her complaint that she is disabled under subsection (B) of 42 U.S.C. §12102(2), she still does not meet that standard.  Plaintiff does not have a record of an impairment that substantially limits a major life activity, and thus fails to establish a

disability under subsection (B). A plaintiff can be disabled under this theory if she can prove a history of an impairment, but that impairment must substantially limit one or more major life activities. 29 C.F.R. § 1630.2(k); *Rooney*, 410 F.3d at 381. As mentioned above, all records that she has produced speak to her medical condition but do nothing to show how they restricted any major life activity. Thus, as with subsection (A), Plaintiff has not met her burden of showing that she was statutorily disabled and cannot prove a record of her disability under 42 U.S.C. § 12102(2)(B).

### Subsection (C): Regarded as Having a Substantial Impairment

Plaintiff also does not allege a claim under subsection (C) of 42 U.S.C. § 12102(2). Nevertheless, Plaintiff cannot be regarded as having an impairment to satisfy this subsection. A person can be disabled under 42 U.S.C. § 12102(2)(C) if their employer regards them as disabled. *Rooney*, 410 F.3d at 382. Plaintiffs are regarded as disabled "when the employer, rightly or wrongly, believes that she has an impairment that substantially limits one or more major life activities." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 335 (7th Cir. 2004). But no violation of the ADA occurs when the employer does not believe the employee is disabled and the condition in fact is not substantially limiting. *Rooney*, 410 F.3d at 382. In the present case, as discussed above, Plaintiff's condition was not substantially limiting. (Plaintiff's Response ¶¶ 48, 52, 53.) Thus, Plaintiff can only succeed if she can show that Defendants regarded her as disabled.

Plaintiff has not produced any evidence to show that Defendants actually regarded her as disabled. Although Plaintiff told several West Town employees of her condition, she testified that she did not recall anyone saying anything derogatory or bad about her regarding her condition. (Storch Dep. at p. 98-99.) Two West Town employees, Daniel Gremer and Kevin

Hamill, testified that they never heard any of the Defendants comment about Plaintiff's medical condition. (Gremer Decl., at ¶ 3; Hamill Decl., at ¶ 3.) She talked with Mike Rodriquez, another West Town employee who also had IPF, about their condition. (Storch Dep., at p. 99.) However, Plaintiff reiterated that she only talked about a potential *cause* of the disease, and not about any employees treating her differently as a *result* of having the disease. (*Id.* at p. 100.)

Fiedler never knew about Plaintiff's inquiry into the company's long-term disability plan. (Defs.' 56.1 ¶ 59.) Plaintiff's inquiry was directed to a Reedy employee. (*Id.* at ¶ 60.) Fiedler testified that he and Bill Reedy never mentioned Plaintiff's illness when they discussed the departmental reorganization. (Fiedler Dep., p. 37.) But even if Fiedler knew of the effects of IPF because of his friendship with Rodriquez, his knowledge of IPF does not show that he regarded Plaintiff any differently or considered her disabled. *But cf. Riemer v. Ill. Dept. of Transp.*, 148 F.3d 800 (7th Cir. 1998) (holding that a plaintiff employed in a fabrication shop that caused his asthma but whose doctor cleared him to work inside the shop was perceived as disabled when employer permanently reassigned him to another department because employer felt plaintiff was unfit to return to the shop). Likewise, no evidence shows that Reedy considered Plaintiff to be disabled. *See Skorup*, 153 F.3d at 515 ("It is not enough for [plaintiff] to show that [defendant] was aware of her impairment; instead [plaintiff] must show that [defendant] knew of the impairment and believed that she was substantially limited because of it.").

The other pieces of Plaintiff's evidence, including her testimony of her difficulty walking up steps, or when she began taking around-the-clock oxygen, concern a period of time after she left West Town. (Pltf.'s Resp. ¶¶ 49, 51.) Therefore, this evidence cannot speak to how West Town, as Plaintiff's employer, regarded Plaintiff's disability.

Thus, assuming that every fact Plaintiff has stated is true, and resolving all disputes about her health in favor of the Plaintiff, no fact the Plaintiff has presented actually speaks to the issue of whether her condition impairs a major life activity to satisfy subsections (A) or (B) of 42 U.S.C. §12102(2), or whether Defendants regarded Plaintiff as having such a disability to satisfy subsection (C). Plaintiff has proven that she suffers from a tragic and unfortunate condition. Yet she has proven nothing about its impact on her life activities, other than that there is no impact. She can still "do it all." (Storch Dep., p. 109.) While it is inspiring that Plaintiff has not let IPF prevent her from living her life, she simply is not disabled under the definition of the ADA. As no fact Plaintiff has proven or could prove at trial will be outcome-determinative, there is no genuine issue as to any material fact. *Insolia*, 216 F.3d at 598 (a material fact is a fact that is outcome-determinative under the governing law). In fact, Plaintiff's "own testimony leaves no doubt that [s]he is able to perform the tasks central to most people's lives, and this in itself dooms [her] claim that [s]he is actually suffering from a disability cognizable under the ADA." *Rooney*, 410 F.3d at 381.

Because Plaintiff has failed to show a material fact as to whether she is disabled under the ADA, it is unnecessary to evaluate whether the evidence Plaintiff has produced to address the other requirements of her *prima facie* case are sufficiently material to defeat summary judgment. Moreover, because summary judgment for this claim is granted, it is unnecessary to consider Defendant's claim that Reedy is not Plaintiff's employer under the ADA.

### *Count II*

Plaintiff also brings a supplemental claim under Illinois law against Defendants for defamation *per se*. She claims statements Fiedler allegedly told other West Town employees about Plaintiff imputed an inability of Plaintiff to perform or a lack of integrity in performing her

job at West Town. (Compl. ¶ 31.) Specifically, her complaint alleges that Fiedler told other West Town employees that Plaintiff "had been called into Fiedler's office on numerous occasions due to errors in her work," "was letting other employees do her work," and her "computer was full of games she had downloaded and that [Plaintiff] played games all day." (Compl. ¶ 20; Pltf.'s Resp. ¶ 62.) Defendants deny these allegations and claim that: (1) the alleged statements were never uttered, and (2) even if they were uttered, they are protected because they are either true or entitled to an innocent construction. (Defs.' Mem., pp. 13-14.)

Under Illinois law, a claim for defamation can be *per se* or *per quod*. *See Kolegas v. Heftel Broad. Corp.*, 607 N.E. 2d 201, 206 (Ill. 1992). A claim for defamation *per se* requires no extrinsic facts to explain the defamatory character of the statements. *Id.* Statements under this type of claim are so harmful that a plaintiff need not show special damages. *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296 (Ill. 1996). Plaintiff has alleged only a claim for defamation *per se*. (Compl. ¶ 1.)

For statements to be defamatory *per se*, the alleged false statements must be of one of several categories: "(1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession or business." *Bryson v. News Am. Publ'ns., Inc.*, 672 N.E. 2d 1207, 1214 (Ill. 1996). Plaintiff claims that Fiedler's alleged statements fall under the third and fourth categories. (Compl. ¶ 20.)

Plaintiff can succeed on her claim for defamation *per se* under Illinois law if she can show that: (1) the defendant made a false statement concerning the plaintiff, (2) there was an

unprivileged publication of the defamatory statement to a third party by defendant, and (3) she was damaged. *Wynne v. Loyola Univ. of Chi.*, 741 N.E. 2d 669, 675 (Ill. App. Ct. 2000).

Thus, Plaintiff's first task is to show that Fiedler's alleged statements were even uttered. Plaintiff has failed to meet this first step because all the evidence that Plaintiff has produced to support her defamation claim is inadmissible hearsay. She has produced no other admissible evidence that will create a material dispute at trial. As a matter of law, Plaintiff's defamation claim therefore must fail and the Defendants are entitled to summary judgment on this claim.

Plaintiff did not hear Fiedler utter the allegedly defamatory statements. (Pltf.'s Resp. ¶ 63.) She claims that Brian Yansek, another West Town employee, told her about Fiedler's alleged statements. (*Id.* at ¶ 64.) But Plaintiff testified that Yansek did not hear the statements from Fiedler. (*Id.*) Rather, she claims that Yansek heard about the statements from West Town technician Kevin Hamill during a breakfast with Yansek, Hamill, and a second technician, Daniel Gremer. (*Id.*) Plaintiff admits Gremer never actually heard Fiedler utter the statements, claiming that Gremer only heard about the alleged statements at the breakfast with Hamill and Yansek. (*Id.* at ¶ 69.) Plaintiff claims that only Hamill heard Fiedler say the defamatory statements; Hamill then told Yansek, who in turn told Plaintiff. (*Id.* ¶¶ 66, 67; Storch Dep., at p. 73.)

Fiedler denies ever making the allegedly defamatory statements. (Fiedler Decl., at ¶ 3.) Hamill states that he never heard Fiedler or anyone at West Town or Reedy utter those remarks. (Hamill Decl., at ¶¶ 2, 4.) Gremer states the same. (Gremer Decl., at ¶¶ 2, 4.) In fact, the parties dispute only these two facts: Whether Hamill heard Fiedler make the statements, and whether Fiedler actually uttered the statements at all. (Pltf.'s Resp. ¶¶ 68, 70.)

But both disputed facts must be resolved in favor of the Defendants. Plaintiff's testimony that Hamill told Yansek about Fiedler's alleged comments is hearsay. *See* Fed. R. Ev. 802. She is attempting to use Yansek's out-of-court statement to prove that Fiedler uttered the statements. *Id.* The record does not contain any declarations or depositions by Yansek. But even if the record contained such information, Plaintiff's claim would still fail because any possible testimony by Yansek of what Fiedler told Hamill is hearsay as well. *Id.* Yansek did not hear Fiedler's comments and cannot prove that Fiedler said them by using what Hamill allegedly said. *Id.* Plaintiff even admits that the evidence she has brought forth is not admissible. (Pltf.'s Mem., p. 14.)

Nevertheless, Plaintiff "believes at trial that she will be able to produce admissible evidence on this point." (*Id.*) Yet, discovery in this case is complete. At this point, Plaintiff must do more than offer a vague hope of producing admissible evidence for trial. *See Greer*, 267 F.3d at 729 (A party must do more than rely on unsubstantiated facts to defeat summary judgment.). In a motion for summary judgment, the Court will only consider evidence supported in the parties' Local Rule 56.1 statements. *Bordelon*, 233 F.3d at 529. Plaintiff has brought forth no evidence to support the defamation claim other than her own testimony that Yansek heard the statements of Hamill, who heard the statements of Fiedler. (Storch Dep., pp. 71-73.) Plaintiff herself concedes that such information is inadmissible hearsay. (Pltf.'s Mem., p. 14.) At the summary judgment stage, a plaintiff must put forth sufficient facts supported by the record in order to survive judgment. Therefore, Plaintiff's defamation claim must fail.

Because Plaintiff has not produced any evidence to create a dispute as to whether the alleged statements were ever uttered, this Court does not address the Defendants' affirmative defenses of truthfulness and innocent construction.

**CONCLUSION**

For the foregoing reasons, Defendants motion for summary judgment on both counts is granted and judgment is entered in favor of Defendants.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: July 31, 2006